This is a second appeal. On the former appeal the conviction was set aside for errors in the charge of the court. The case on the former appeal has not been reported, but will be found published in 13 South-western Reporter, page 650.
Hon. W. L. Davidson having been disqualified from sitting in the case, and Presiding Judge White and Judge Hurt having disagreed as to the admissibility of the testimony taken on the habeas corpus trial, R. H. Ward, Esq., was appointed special judge in the case.
The evidence adduced on the trial is as follows:
Jesse Rudder, a witness for the State, being sworn, testified as follows: My name is Jesse Rudder. I am in my fortieth year. My occupation is that of a hackdriver. I have been in the city of San Antonio nearly fourteen years. I have been in the hospital for the last month, and was brought from thence to-day. I knew James Draper in his lifetime; had known him since he was a good-sized boy. I saw defendant Childers the night of the 26th of November, 1889, on the outside of the Minger Hotel bar. I was driving a carriage that day. I had first seen Childers on that day about dusk, I guess. I did not know his name at that time. [Witness pointed out defendant in court] No one was with him when I saw him. I was not with him at that time, but afterward, in the capacity of a hackdriver. He was riding in my carriage. He rode in my carriage from 7:30, the time he got in, and I had him three hours and a half. He was not alone in the back with me. He got out of my back, and I last saw him at the Menger Hotel. He was alone when he got out of the back. I saw him after he got out of the back in the bar room of the Menger Hotel. I went in there with him. No one went in with us. John Russell and Albert Richardson were behind the bar when I went in. The way I came to go in the bar was that he (defendant) asked me to take a drink. This was just after he got out of the carriage. I consented to go in. After he got in he told me to come around in the morning to get my money for riding in the carriage. I told him I would rather have it that night — I was running all night and couldn't get up in the morning and lose my sleep, or something to that effect. Then he turned to the barkeeper and said, "I am not going to pay for that drink" — that is, the drink that he called me in to take. I made a remark then that I would get the money, and turned my back on him and started out, and he followed me to the door. When we got outside I stood in front of the door and stood facing him, with both hands in my pockets. In the meantime Jim Draper followed soon after and walked to one of those boxes which surround the trees in front of the Menger, and was standing with his hands up on the top of the box, and he (defendant) said, "How long did you have me!" and I told him I got him at 7:30 *Page 162 
o'clock, and I thought it was $4; and he said, "You are a G — d damned lying son of a bitch." Jim Draper rushed toward him and attempted to get his coat off, and Childers ran backward. Draper said, "That is too much for a cripple to take," and rushed toward him, and I suppose got within about three feet of him, and I noticed Childers with his hand under his coat that way (indicating with his hands in the proximity of his hip pocket) and pulled his pistol out and shoved it forward and fired his pistol at Jim Draper. The next time I saw Jim Draper he was lying dead in the Menger Hotel billiard room, possibly five or ten minutes after the shot was fired. I saw that he was shot in the left breast, near the nipple — near the middle of the left breast. After Draper was shot he said, "I am shot! Oh, I am shot!" and then ran to the door, and the next time I saw him he was lying dead close to one of the tables. As soon as Childers fired the shot he ran and turned around Carter Mullally's corner and turned into Crockett Street, running toward the Alamo, in the direction of the north. When he turned into Crockett Street he was going east. Draper had nothing in his hand; he had hold of his coat. He was holding his coat open with both hands. He was trying to get his coat off when the shot was fired. I didn't notice any one else there at the time the shot was fired. I saw nothing of Childers any more that night. Frank Cochran was in the carriage with him that night. I don't remember seeing Childers and Cochran in company that day. I can not say positively that I saw Cochran at the Menger Hotel, or that he said anything to me in the Menger Hotel in the presence of the defendant. I don't know where Cochran was at the time the shot was fired. I couldn't tell you where he was immediately before that. At the time Childers was in the bar room I had no idea where Cochran was. I saw the deceased (Draper) and Judge Dibble standing in the bar room talking together when we went in. I don't know how long I was in the bar room with Childers exactly — long enough for him to go and take a drink, because I had to go to my team. I don't suppose it was over ten or fifteen minutes, if it was that long, after I got out on the sidewalk that Draper came out there, before the shot was fired. I know a colored man by the name of W. H. Ellis. I did not see him at all at that place that night. No one followed Childers down toward Crockett Street to my knowledge. I saw him (Childers) when he turned the corner, and he was the only one that I saw. I don't know if any one followed him. This happened in Bexar County, in the State of Texas. Immediately after the shooting I did not go away, but I went over and notified the police, and I met — I think it was Captain Shardein and another officer, and brought them over to the Menger. I did not leave there before Draper died. He was dead before I left him. He (Draper) fell in the part that was used as a billiard hall at that time, where the billiard and pool tables were. Draper said, "It is too much for a cripple to take." I am a *Page 163 
cripple and have been so since I was four or five years old. I can not state the number of years I had known Draper, but I had known him a long time before he grew up to manhood. We were friendly always toward each other. Jim Draper was a hackdriver by occupation. I am a cripple to the extent that one of my legs is nothing but a bone, and the other having to do all the work, it has disabled that a great deal. Judging from appearances defendant Childers is fourteen times stronger than I am at the present time. He is a good deal taller, and is the heaviest and biggest. When Childers made use of the expression, "You lying son of a bitch," he seemed as though he was angry. I was talking with him, and he asked me the time and I told him, and he said, "You are a G — d damned lying son of a bitch." I don't remember what position he had his hands in. We were standing face to face with one another about eighteen inches or two feet apart. I told him the time he had been with me correctly. It was a true statement of the time that he had been riding with me. That shot was fired, and Jim Draper died in Bexar County, State of Texas.
Cross-examined: I am now in bad health, and have been sick I may say from about a month after the last trial, but not so sick as I have been in the last month. I have been quite sick recently and been a good deal pulled down by my confinement; have been in bed at the city hospital under treatment by physicians. I had been a hackdriver prior to the killing a good while; I can not say positively how long. I had been coming to San Antonio for a number of years before I came here permanently. I came to San Antonio from Cuero, De Witt County. The first thing I went at after I came here was hackdriving, and have been here a number of years, being now in my fortieth year. I was about 25, I think, when I came to San Antonio. I pursued my avocation of hackdriver in San Antonio from the time of my arrival to the time of the killing, and some time thereafter. At the time of the killing I was a sound man outside of my leg. I was as strong as a man is supposed to be with a lame leg. A lame leg does not prevent a man from being strong when he has only one good one to stand on. I was able to take care of myself with an ordinary man — that is, not too big and heavy for me; but I don't know how I would stand with a man like Childers. I had difficulties in the course of my business, but none like that. I do not remember of having any personal encounters or difficulties during my occupation. I do not remember having any difficulties while I was a hackdriver. When I was a hackdriver I had to take care of myself at that time. It is hard to say whether I won the fight I did have. I don't know whether the other fellow got enough of it; I couldn't say. I don't remember what the result of that confliet was. I did take part in the one that I have referred to. I don't remember now the result of that fight, whether I got whipped or whipped the other man. I can't answer the question. I drove my *Page 164 
hack in the day-time, and when I did I didn't drive at night. I was at that time driving at night altogether, and staid up all night. That had been my life for two or three years. I think it broke my constitution up pretty bad. A man has to be a pretty strong man to stand that. I saw Draper when he came out of the door of the hotel on the sidewalk. The first time I saw him after I left the bar room was at the door coming out. I don't know what he did or said prior to the coming up to the door. I left him and Judge Dibble in there. Childers was right behind me when I turned around. I couldn't say what he was doing when he followed me out. I didn't look back at him at all until I faced him on the outside. I don't know the position of his hands when he came out. I had my back turned toward him until we got to the sidewalk. After we got out there I didn't notice his hands during the altercation. I was looking him in the face. I never paid any attention to his hands. I was looking at his face. I think in looking a man in the eyes I could see him draw a six-shooter. If he lifted his arms I could. I didn't notice his hands at the time he was cursing me for a son of a bitch. I suppose I would notice it. I couldn't state the exact distance I was from Childers at that time, but I don't think we could have been further than two feet apart, if that far. There was nothing to prevent Childers from striking me if he felt inclined to do so. There was nothing on earth to prevent Childers from shooting me. I had my hands in my pockets. At this time Draper was five or six feet — somewhere near there — from where Childers and I were standing, near the door and in front of the door just outside. I would have had to make two or three steps to step inside the door from where we were. Childers could step right up upon the stone in front of the door. Draper was standing leaning against, the tree-box on the sidewalk at a distance that must have been, I guess, eight or nine feet; I couldn't say positively. One step on the stone step and one in the door would have put Childers inside the bar room. The next thing I noticed after Childers made use of the offensive epithet was Draper running from where he stood toward Childers. He (Childers) then started running backward up toward Carter Mulally's, not into the room. He got just about even with the next door. He was about the center of the other door. I first saw the pistol when he shoved it out. I saw him when he pulled his hand out of his pocket. This was when he got down apposite the other door where the light was shining, and that was the first time I saw it. In the light from that room by this door where I first saw him drawing the pistol was where I first saw him. That was after he (Childers) had retreated this distance that I have just spoken of. Childers said not a word that I remember of. I could not say whether or not Childers had ever seen the deceased before. I could not say whether they were acquainted in any way-Childers was a stranger in San Antonio, especially over in that part *Page 165 
of the town. I had never seen him but once before. He was stopping at the Menger Hotel temporarily, and I took him as a guest of the hotel. I did not see any one there. I did not look to see any one; all I saw was Childers. When he fired the shot my attention was directed to him running back around the corner. I do not remember about seeing Ellis at all. My attention was fixed entirely upon the difficulty, first between myself and Childers, and second between Draper and Childers. I am sure that I saw everything that passed between them — everything that either one or the other did. When I saw Draper rushing upon Childers and Childers retreating I made no effort to hold back Draper. I did not tell him to stop, and I didn't take hold of his arm or in any way endeavor to keep him off. I never touched him in any way. I could not say if Childers was somewhat excited. I don't know whether he was or not. He seemed to be angry at the time he made that remark. The attack was made on him just as soon as he made that remark. If he was very angry he could not get cool in that time. He must have been very angry. I do not remember hearing any one, either Mr. Sinclair or any one else, say, "Stop, Jim! Stop, Jim! the son of a bitch has a gun!" I did not see any one, Mr. Sinclair or any one else, try to interpose himself or his arm between Draper as he came on toward Childers and try to hold him back. I do not see how I could help seeing that if it had been done.
Q. — Mr. Rudder, is it not a fact that Childers, the defendant in this case, had had this altercation with you, that that altercation had been brought to a close, and he was turning to go into the hotel when this remark was made by Draper, the deceased, about you being a cripple?
A. — He was not turning to go into the hotel, Mr. Aubrey; that I am positive about. He was not turning to go anywhere. When he called me a G — d damned lying son of a bitch Jim Draper rushed toward him and said, "That is too much for a cripple to take," and nothing transpired between calling me this epithet and Draper rushing toward Childers. I saw Mr. Cochran there after Jim Draper had been dead about half an hour. I did not see him during the altercation. I did not see Childers and Cochran retreat and leave me on the ground after this had passed between me and Childers. Frank Cochran never came to the hotel until about an hour after. Jim Draper was killed before Cochran came to the hotel at all. That was the first time I saw him.
Q. — You have just stated that he did not come until about an hour after. I am speaking about right there on the sidewalk. You are sure he was not on the sidewalk during this difficulty between you and Childers?
A. — He could not have been there. If he was there he was standing off somewhere.
Q. — If he was standing there near Sinclair and near Ellis you think you would have seen him? A. — Possibly so. If he had been there I am satisfied it never would have happened. I am satisfied he was not *Page 166 
there. Draper had his hand up on the tree box before the shooting, and when he (Childers) called me a G — d damned lying son of a bitch the deceased Draper rushed toward him. [Witness then drew a diagram and explained the position of the parties.] Childers' face was turned toward me and he continued to face me and I was facing him. When Childers called me that epithet I did not see Draper approach. He got nearly to me when I did see him. He came up from by my right when he started to make this remark that called my attention. I suppose he got nearly opposite me when Childers started backward, and his going backward attracted my attention. I could not see Mr. Draper nor the position of his hands until he got on a line with me, and it is then that I noticed him. I recollect testifying in this case on the habeas corpus trial. I generally write the way in which the signature presented to me now appears. I recognize it as mine. [Here counsel read to witness a portion of his testimony given upon a former trial of this case upon the application for a writ of habeas corpus.]
Q. — Now are you satisfied that Cochran was not there? A. — There are lots of things I guess that I don't remember now. If I said it then, I guess he was. If it was true then it is true now. I am satisfied now that Mr. Cochran was there. I am satisfied that this what I have just read is true — that this altercation between me and Childers was about to be settled and that Cochran was settling it.
Q. — Now tell the jury when this offensive remark was made. Was it before or after this difficulty had been settled by Cochran? How are you satisfied about that? Don't you recollect right now from what I have just read to you? Don't you recollect that this remark had been made before, and Mr. Cochran then came in and settled the difficulty and was going back with Childers into the hotel: A. — You are right about that, Mr. Aubrey. It was then that Draper made this remark about "You can't curse a cripple," or something of that sort, and then rushed across the pavement while Childers and his friend were going back toward the hotel, and that is how they came to be backing away. I remember now of Cochran trying to get Childers to go into the hotel.
Q. — And you have told the jury that he was going into the hotel and the difficulty was patched up between you and Childers? A. — Yes, sir; up to that time he asked me what time I got him.
Q. — And after they had started to go into the hotel it was at that time that Draper rushed across the sidewalk toward Childers; isn't that so? A. — Yes, I guess it is. I don't recollect the day after the shooting, at Carter Mullaly's livery stable, about talking about this transaction nor making a remark there that if Childers had not shot Draper when he did that he would not have been able to shoot anybody else for some time, or would never have been able to shoot any one else. I am positive I did not say so. I do know a man by the name of *Page 167 
Lattimer. I do not remember saying this at that time and place to him. I did not say it or anything to that effect. I might have said this — if Jim Draper had not got shot I might possibly have got it. I did not say anything like what has been repeated to me. I am positive of that.
Q. — Are you just as well satisfied about it as you were that Mr. Cochran was not on the sidewalk? A. — I know I did not say it. Cochran settled my bill that night, and that ended the altercation about the bill.
Q. — And it was then they turned to go in the hotel? A. — Mr. Cochran was in the hotel. That is the first time I saw him.
Q. — That night? A. — No, sir; not that night; after the riding was over. That was the first time I had seen him after he had left me at Sbolz's Garden.
Q. — Who settled the bill? A. — I couldn't say positively which one did the talking, to save my life, in making my employment for that night. I have seen Cochran once before. I have seen Childers once before.
Q. — You say Childers and Cochran turned to go back into the hotel. Now, which door was it they turned to go into? Was it the front door of the hotel or was it the bar room door? Which one of these doors was it they turned to go into? Isn't that about where it was (indicating on diagram)? A. — Yes, sir. I do not remember which door Childers and Cochran were going toward when this altercation was over between me and Childers. Jim Draper was a good big stout boy. He was strong at that time. I do not know about his activity. He weighed about one hundred and fifty or one hundred and seventy-five pounds, and was 23, or 24 years old, and was a full-grown man. Re-direct: I came to the court house in a carriage. Erysipelas and dysentery are the complaints that I have been in bed with. The crysipelas was in my head and face. I think that impaired my activity. The only conversation that passed between Mr. Cochran and ourselves in the bar room or outside was, Frank Melrose was the driver they wanted. I do not remember everything Cochran said or did, nor everything that I had to do with him about the payment of the back bill. This was after the shooting. I do not know exactly how long after. I think about an hour or so afterward. I had not been paid before the shooting. I did not see Cochran before the conversation on the sidewalk. I do not remember having anything at all to say to him on the sidewalk just before Jim Draper was shot. I have no recollection about it. I do not remember the exact time Cochran paid my back bill, but it was after the shooting. My mind was fresher at the time I testified on the habeas corpus trial than it is now, a good deal more so. If upon that examination I stated, as Mr. Aubrey read here, that I did see Mr. Cochran, it is more liable to be correct than what I *Page 168 
am now saying. I am more liable to be correct in my testimony about Mr. Cochran on thehabeas corpus trial than I am to-day. [Defendant here introduced as a part of his cross-examination a diagram marked exhibit A, made by the witness Rudder, showing location of doors and position of parties.]
Albert Richardson, a witness for the State, being sworn, testified: My name is Albert Richardson; age 51. Have lived in San Autonio eighteen years. I know the defendant Childers. I knew James Draper in his lifetime. I saw the deceased before he died. I was at that time glass washer at the Meuger Hotel bar. John Russell and myself were behind the bar that night. Russell was there to serve customers. I saw Judge Dibble that night. Mr. Rudder and the defendant came in the bar room somewhere after 10, or in that neighborhood, that night. Childers asked for a whisky toddy, and Mr. Russell waited on them, and when he was fixing up the toddy Childers said, "I am not treating this man; I drink by myself." Mr. Rudder said, "I didn't want you to treat me; I am not after that. I am after my money." Childers said, "I will pay you in the morning, and not before." Rudder said, "You are going to leave in the morning, and I won't be up. I want my money now." He said, "You can't get your money now." About that time he threw his hand behind him and they went out of the door. Mr. Rudder went out of the door first and Childers just behind him with hand this way under his coat (indicating). That was all I saw. Nobody was in the bar then but Jim Draper and Judge Dibble, and Draper went out shortly after. Draper did not do or say anything in there. He was not in the conversation at all. He was at the far end with Judge Dibble. He was not in the conversation with the gentlemen at all. He said nothing relative to this question between Childers and Rudder. I suppose it was two or three minutes after Childers went out that Draper went out. I heard the shooting after Draper went out. It must have taken place a couple of minutes after Draper went out. I heard one shot fired. When I heard that shot fired I ran out in front. I saw Mr. Draper. He came in, but I did not see him until I come back. He was lying in the billiard room trying to catch his breath. I ran for a doctor. The manager of the hotel told me to go for a doctor, and I ran in the drug store, and pretty soon the man came over. Then I came back to Draper and found him dead. I saw no arms on him not anything in his hands. He had his coat on. I do not know who turned him over or who handled him. I rushed to the door after the shot was fired. I heard somebody say, "Catch him! Catch him!" That is all. I did not see Childers out there. There was a lot of backdrivers there. I do not know who they were. I know a man by the name of Ellis. I saw him around there that night. He was knocking around there all night. I know a man by the name of Frank. I saw him that night in the early part of the night. I did not see him about the time of the shooting. I did not see him about *Page 169 
the shooting. I did not see anything of Childers that night after he followed Rudder out.
Q. — What was the tone of his voice when he said he was not paying for Rudder's drink? A. — He spoke in good language. Childers went out right behind Rudder. When Rudder started out he said he did not want anything to drink; he just wanted his money. I don't recollect Rudder saying anything else but that. He was after a hack bill. He only asked for his money — for his back bill. After Childers refused to pay the hack bill Rudder said that he would like to have his money. I do not know where Draper was shot.
Cross-examination: I am now the messenger for Mr. Callaghan, the mayor. I suppose I am the man they call the "Mayor's Pet Coon." I have been working there about sixteen or seventeen months. Before that time I was at the Menger Hotel. My regular occupation is just general job work or anything. I have always worked at that or steam-boating — just general job work. It was a little after 10 o'clock, I think, when I noticed those people in the bar that night. When I saw Draper, the deceased, and Childers and Rudder in the bar, there was nobody there at that time but Mr. Rudder, the barkeeper, myself, Judge Dibble, and Mr. Draper and Mr. Childers. They were the ones that were in there at the time.
Q. — What position at the bar did Draper occupy at that time? A. — None at all, only in conversation with Judge Dibble, and they were standing at the far end, talking. The far end is the end just as you come in to the front of the bar. Draper was there talking to Judge Dibble. They were on the opposite side from Rudder and Childers, at the other end of the bar, I suppose about four or five feet apart. They were away down at the far end and these gentlemen were out in front. They did not seem to be paying any attention to these parties. The conversation went on and they did not pay any attention to it. Rudder turned to go out just as soon as he (Childers) got his drink. While Childers was taking his drink Rudder left and went out. Childers walked right behind, close up behind him, walking just like a man who was marking time. I could not see whether he could reach him. I was looking right at them and could not tell whether he could touch him or not. I know he was very close behind him. They were keeping step going out, marching in military style. I suppose Rudder saw Childers following him. Rudder's face was going out of the door, and Childers was right behind his back. I did not see him (Rudder) turn around at all. They were out on the sidewalk two or three minutes before the shooting occurred, I think. It could not have been ten or fifteen minutes, I suppose. I haven't any very exact idea of the lapse of time. It could not have been as much as five minutes. I could not answer whether Childers bad time to draw his pistol and kill Rudder out on the sidewalk before the shooting took place, before he killed *Page 170 
Draper. He could have done it. I can not tell how long it takes to draw a pistol and kill a man. I know that I am under oath. I know that I am swearing in this case. I suppose Childers was out long enough from what he had done to draw a pistol and discharge it before killing Draper. I can not say whether he could have shot off a pocket full of pistols. I am not a judge about that. It was done very shortly after he went out. I do not know anything about what transpired on the sidewalk. I did not hear any voices out there as if they were talking. I paid no attention to it after they went out. I was behind the bar. I could not know anything about it. I did not pay any attention or take any further interest after they went out until the gun went off. I did not pay any attention to the lapse of time or anything else. I can not answer whether they had a conversation up there and a considerable altercation, because I do not know anything about it. I can not answer if they may have had it. I do not know anything about it. I am answering so far as I know. Childers had his right hand under his coat. I did not see him display any pistol at any time. I did not see him draw anything from his pocket. I never saw anything but the act of his hand. I do not know if there was anything to keep him from drawing his pistol. It did not seem as if there was anything to prevent him from drawing his pistol. I suppose it was a dress coat Childers had on, from the looks of it. I would not swear that it was a dress coat. I want to tell the truth, but I won't swear whether it was a dress coat or not. I am not positive about that. I know it was a black coat, though. I do not know why he put his hand back there. He might have put his hand back there to draw his handkerchief. I can not tell. It did not impress me as a matter of importance at that time; that's right. All the men I mentioned just now were in the bar at the time that Rudder and Childers disappeared out of the door. At the time of the killing there was a partition of some kind separating the main body of the bar from the wall, with swinging doors, but they did not go out of the swinging doors. The door they went out was an outlet only. There was no swing to it at all. You go out of that door and step right on the sidewalk. It is about three feet between the partition and the outside door, perhaps a little more.
Q. — Did you notice when Childers went out whether or not anything he said was of a threatening character. A. — I can only explain as I did at first. I said he spoke rather rash, and that is all I can express. You can judge from a rash conversation. I can not say whether it was threatening or not. John Russell, when these men went out, was standing looking at them just the same as I. When they went out the deceased Draper was still standing there talking for about a minute or two minutes, I suppose; I could not say. I am just explaining as near as I can. I could not say whether it was a minute or a minute and a half. I know he went out shortly after him. I get as near as I can. *Page 171 
He went out shortly, behind him, and he went off. Pretty soon after he went out the gun went off. He did not say a word to anybody when he went out. Draper had been in the bar there about two hours when Childers and Rudder came in. I did not see him drinking anything. He was just in there. He did not take anything while he was in there, during that hour and a half. He was cool and sober. Nobody went out from the saloon besides Draper, Rudder, and Childers. Judge Dibble remained in there until the gun went off. When that went off they all rushed toward the door. I was ahead of them all. The only thing I saw was a lot of men out on the sidewalk, and they cried, "Catch him! Catch him!" I saw Jesse Rudder there. I did not recognize any one else, but as you speak of Sinclair, he did come in the door as I was going back in, and about that time Mr. Browder rushed out and told me to go for a doctor. I did not see Ellis out there. I could not say how many people were out there. I suppose there were more than four or five. A lot of people from that pavilion ran over there. I was in the bar attending to my business. I do not know whether these people got there before I got from behind the door. I saw those people going back over there to the pavilion afterward. I never told anybody about seeing Childers coming out of that room with his hand under his coat but the court. I never spoke about this case except in the court. That was at the examining trial. I never told anybody about that, and that — the time of the examining trial — was the first time I ever mentioned this fact. Childers put his hand behind him after he (Childers) started out. It was after he took his drink that he started out right behind Rudder. Rudder waited until he had his drink and then he (Childers) followed Rudder out right behind him. Just as soon as he (Childers) took a drink he put his hand behind him.
Q. — You say Rudder waited until he took his drink before he started out? A. — I don't know but he followed him right along after he took his drink.
Q. — Then he put his hand behind him before he started out? A. — Oh, no.
Q. — I want to know whether or not he put his hand under his coat before Rudder started out or afterward? A. — He put his hand under his coat before Rudder started out. When he took his drink and turned around this way (indicating) Rudder started out and then he threw his hand around and followed right behind Rudder.
Q. — I think you said Rudder waited until after he (Childers) got his drink? A. — I suppose so. You can judge of that yourself. He wanted his money.
Q. — What I wish to understand is, if he waited until Childers got his drink and then Childers put his hand under his coat just after he started? A. — He just did the act, and that is all I can say about it. *Page 172 
Childers and Rudder were standing side by side close to the counter. I was at the far end of the counter, washing glasses. I was looking right at them. I cleared the glasses away that they drank out of and wiped the counter off. Jesse was the nearest one to me. He was between me and Childers. He was next to me and Childers was next to him.
Q. — Was there anything to prevent Rudder seeing that motion with his hand? A. — I suppose it would prevent him. He was going out.
Q. — Could he have seen it? A. — He could if he looked back.
Q. — Could he have seen it while they were both there at the counter together? A. — Of course, he could have seen it if he had paid any attention.
Q. — Standing right next to him, was he? A. — Yes, sir; until he started away.
Q. — Quarreling about this back bill? A. — Yes, sir. L. D. Dibble, a witness for the State, being sworn, testified: My name is L. D. Dibble. I am engaged in the practice of law. Have resided in San Antonio between ten and eleven years. I knew James Draper in his lifetime. He is now dead. I remember when he died. It was the 26th of November, 1889. It must have been 10 or 11 o'clock at night when he died. It was in Bexar County, in the State of Texas, that he died. I spent the evening with him for an hour or so that evening of his death, and I had met him occasionally before. I had been with him that evening about an hour or an hour and a half. This was at the Menger Hotel bar room. I do not know that I recognized the defendant. I never saw him but once, and that was the evening of that occurrence, and then only for a few moments. I know a man by the name of Jesse Rudder. I saw him and Childers that evening. I was talking with Draper at the street end of the bar counter, and John Russell was there talking with us part of the time and part of the time not, and I recollect Jesse Rudder running into the bar room quite hurriedly and going to the bar and telling the barkeeper that he wanted that money, and they told him there was no money there for him, and he said there ought to be $2 or $2.50. I paid but little attention to it at that time, because I was talking to Draper the most of the time, and Jesse said the money should be left for him. Then he started and left the bar counter. He was alone. The other gentlemen were not there. He rushed to the entrance door to the bar room, the usual entrance — I mean street entrance — and met the ones that I supposed were Mr. Childers and another gentleman, and they rushed right back again to the same place in front of the counter and had some controversy about the money. Jesse claimed that the one that was pointed out to me by the name of Childers said he did not owe him anything and would not give him anything. Jesse turned around and started very rapidly for *Page 173 
the street door and said, "I will have my money, and I know how to get it." And then the other two gentlemen followed right out. During this time I had been talking with Draper at the street end of the bar, but not at the regular street opening, but where they go through to go into the billiard room, or did at that time, and he and I had been talking and he turned to go out and bade me good night and went through that door out. John Russell, the barkeeper, was standing nearest, nearly on the inside of the bar, at the time he turned and went out, and it was not more than a minute or two after that before I heard the crack of a gun and Draper had gone out. I told John Russell I guessed we had better stay on the inside of the house, and so we did not go out until the excitement was partially allayed, but I did soon go out with the engineer of the Menger Hotel and met Mr. Browder, and he followed, and Draper was lying on his back dead. I was standing at his head, Mr. Browder was standing on the side between his body and the street, and the engineer was on the other side. Mr. Browder drew up the shirt of Draper, and we together rolled him on his side so we could see where he was shot. I think he was shot below the left nipple, somewhere near there. Jesse Rudder left, saying he knew where he would get his money or how he could get it, and started to run very rapidly. He was followed by two gentlemen. Childers was one; I do not know the other man. This was before the shooting, I do not think I would know the other man if I saw him. I heard his name afterward. One of the men was said to be Childers and the other I do not recollect what his name was. During the time that this conversation was going on there in the bar relative to this money, deceased (Draper) did not say anything concerning it. We were entirely separate there; we had been talking over other matters. There was nothing said by Draper about the controversy, according to my recollection. To my notice he did not seem to be paying any attention to it. We did not pay any particular attention to it any more than the talk called our attention to it. Draper went out of the door at the west end of the counter, in the old bar room. There was a door opened through there into the billiard room, and he stepped out that way. The others went out the regular street entrance, south of that. When Drapor went out he did not, if I recollect right, have to go through another room to get an exit on the street. The bar opened on the street. There may have been a doorway between the bar door and the street, but my recollection of the old bar is there was nothing in the way but open doors — folding doors. I think Draper went out about a half a minute after the other parties. Jesse and the other parties bad to go a little further to go out than Draper did, because he could step right out, and there could not have been more than a half minute difference in the time of their going out. I do not think it was a minute after *Page 174 
Draper went out before I heard that shot fired, perhaps not more than half a minute. I know it came very quick. I think Draper must have got out a very little before the other parties, because they had to go further and go through a doorway further off. Draper, all he had to do was to turn around and go out.
Cross-examined: I saw Albert Richardson. He was at the far end of the bar room. He was there while the other parties were there; I do not know how much of the time. I think he was there at that time. While Draper and Childers and myself and this other man whose name I do not know were there. I suppose there may have been others in there, though I did not notice particularly. Albert Richardson, the witness who has testified, was there at the time Childers and Draper and this other man were there, I think. If he was there at all he was behind the bar at the further or east end of it. John Russell was there also. Some one came into the room with Childers while I was there. When Jesso left the first time and went out to go to the door he met these two gentlemen at the door or near by the door. He may have been just outside the door and he started right back and they followed him, and Jesse took his place at one location and they took their places at his right hand — I mean the right hand of Jesse. They both stood below him in the bar room. The three stood there together for a moment. Jesse was demanding his money. The talk was pretty loud; that is the reason I heard it. I was but a few feet from them. The under end of the counter where the wash basin stands in which they wash glasses was the east end, being the far end from me. That is the end where Albert Richardson spent his time waiting on the barkeeper, and that is his proper place. These three men were standing not far from the center of the bar and near this wash place, just as far from one end of the bar counter as the other. The parties who came in with Rudder went further east than where I was. I was at the west end with Draper. Draper was right up against the partition between the wall and the door. I do not think I saw either one of these men taking a drink or order a drink. I did not notice particularly. I am positive that there were three men standing there together. I know I would be contradicted by some one, but I saw the three together.
Q. — If Albert Richardson had been behind the counter at his usual place could be have failed to see these three men? A. — I can not tell what he would do.
Q. — Any man, judge? A. — I think from Albert's usual position there between the middle and the cast end of the bar, washing glasses or drawing beer, I think he would have been very apt to see whether there were two or three if he noticed anything.
Q. — You are positive that Childers was on the other side; that is, he was to the right of Jesse, while they were standing there? A. — If there were two, he was standing to the right. *Page 175 
Q. — Who was nearest to you? A. — Jesse was nearest to me.
Q. — And between you and the other man? A. — Yes, between me and the one or two that were with him.
Q. — Don't you know there were two. A. — I think there were two.
Q. — Now, if a man were standing there in front of that washing tank, these two men — the two men that came in with Rudder — Childers and this other man, would be nearest to this man at the washing tank, would they not? A. — Yes; you mean as between me and Jesse, because Jesse would be nearest to me and the other two would he nearer to the washing tank.
J. T. St. Clair, a witness for the State, being sworn, testified: My name is J. T. St. Clair. I knew James Draper. He is dead. I saw him before he died. At that time I was working at the Menger Hotel, in the engine room. I know H. H. Childers, but did not know his name, of course. I know a man by the name of Jesse Rudder. I saw these parties on that night. I can not remember exactly the time, but after 11 o'clock. I saw them at the Menger bar. They had a conversation, but I do not know what the conversation was about. It was between Rudder and the defendant and somebody else. There were two or three of them together. I do not know who the other man was. I do not know what was said between them. James Draper was standing close by the gentleman, a little on the right. They all went out. Jesse went out first, I think; I am not sure. I was at the other end of the bar a little way off, facing the door, when they went out. When Jesse went out they all went, three or four of them together, and the defendant went out about the last. When they went out they were arguing something on the sidewalk — that is, Jesse and the defendant. They were arguing I suppose about a hack bill; I do not know. I could not tell what was said between them. They were going to separate. After they had separated the defendant turned to go toward the postoffice or the hotel, I could not say which, and he said to Jesse, "I will settle with you in the morning, you son of a bitch," or something of that kind, and Draper was standing away back and said, "That is too hard for a man to take," and said, "If you want to fight, fight a man, you G — d damned son of a bitch," and I tried to separate them and the deceased got away. I tried to hold him (the deceased) from running on the defendant. I said, the defendant has got a gun. I said this to Draper. I said, "This man has got a gun," and he (deceased) pulled away and I tried to jump in between them, and the defendant jumped back and Draper jumped right forward and was dropping his coat, and I caught him with my left hand and tried to catch the defendant with the other, and the shot was fired. The defendant fired the shot. Draper was hit. I was in this position when the shot was fired, partly between the defendant and Draper. I said, "This man has got a gun, the son of a bitch." I was talking to Jim Draper. I *Page 176 
knew he had a gun, because as he turned toward the hotel I saw the gun. I told Jim Draper he bad a gun. I know he had it. I saw it right under his coal tail, like this (indicating). I saw this just at the time he turned to leave Jesse. I did not see the pistol until he turned to leave Jesse. At the time I saw that pistol Draper rushed in right after. I saw the pistol first at the time defendant turned to leave Jesse, about a minute or so before the shooting. This was before Draper said anything; I do not know how long before. The pistol was in his pocket. He had his hand just under his coat, that way. The pistol was hanging from his pocket. His band with reference to the pistol was about here (indicating the region of the hip pocket). When I first saw that pistol we were standing there that way; Draper was a little way back, standing up to the tree. After Childers fired that shot he hacked away toward Carter Mullaly's barn, and some one cried, "Stop him?" and all of us started on a run after him, and he started on a run then and we followed him round to Crockett Street, about half way from the barn Ellis also followed him, and was five or six yards, perhaps seven yards, from him. I do not know Mr. Cochran; in fact I never knew him here at all until along about two or three months ago. I do not know where Mr. Cochran was stopping at that time. I did not see anything more of him that night. I never saw him to know him. After I came back I found that Draper was dead. I was gone about a minute before I returned. I went about two hundred yards. When Childers went off everybody cried, "Stop him!" We all did. He did not stop; he turned the corner, and we took on the run after him. We did not catch him. We could have caught him; we just started on the run. We did not expect there was any harm done. I did not think there was any harm done. That bullet came six or seven inches from me. I was between the two. I had hold of Draper, holding him by the breast like this, by the lappel of his coat. I do not know what portion of him I had hold of. I was jumping in order to try to hold him. He was standing like this (indicating), and I said, "He has got a gun." I was attempting to hold the other man in order to keep them apart. I did not see anything in his (defendant's) hand when I jumped at him. It was when he turned like this (indicating) that I saw it in his pocket. That was the time when Jim Draper was leaning up against the tree and the first time I saw the pistol — when he turned to leave Jesse Rudder — then was the time I saw it. I would not be sure what he said to Rudder, whether it was a son of a bitch or a liar he called him. I had not seen the pistol up to that time. It was when he turned to go toward the postoffice or hotel, I could not tell which, that I saw the pistol. When he said that word to Rudder I do not know where his hand was; then he turned to go away. He was standing near the gutter and turned around and put his hand on his hip and went away, and I saw the gun when he went away. He was *Page 177 
standing one or two feet from the hotel door when he shot Draper. I could not say how wide the sidewalk is; it is the widest in the city, I know.
Cross-examined: [Witness draws a diagram at request of counsel, attached to his deposition and marked exhibit B, indicating thereupon the position of the parties.] I came upon the scene from the bar room out of the first door next to the postoffice, the door in front of which is a stone step. After coming out I stood close to the building, next to the wall. Jesse was standing about half way between both doors (indicating on diagram). Childers was standing pretty close. They were all pretty close to the gutter, on the sidewalk next to the plaza. The defendant was nearest to the hotel, while Rudder was standing a little nearer to the sidewalk. That is the position in which they were standing when I first got out there. I do not know what the trouble was about. They were arguing over a hack bill or something. I do not know what they were arguing about. James Draper, the deceased, was standing back here on this side (indicating on diagram). He was nearer to the postoffice than these people. He was down on the edge of the sidewalk by a tree, about seven or eight feet from the others. He was as near the sidewalk as they were. They each changed positions after that. Jesse was crowding the defendant. By "crowding" I mean jumping right around him, trying to get what was owing him. He made some demonstrations as though he was going to jump on the defendant all the time. I thought so from his appearance and expression, by the way he was using himself. He (Rudder) said he would be damned if he wasn't going to get it. It was eight to ten feet across the pavement from the edge of the sidewalk. I have never measured and will not be sure of that.
Q. — Now, did they change their positions? A. — After they got through their talk.
Q. — Who got through their talk? A. — The defendant and Jesse.
Q. — What made you think they got through? A. — I saw the defendant turn to leave and turn to go toward the hotel or postoffice, I could not say which.
Q. — Turned around and left? A. — Yes, sir.
Q. — Going toward the postoffice? A. — Yes, or the hotel; I did not know which.
Q. — Going away from Rudder, was he not? A. — Yes, sir.
Q. — Was it before or after he left that he said, "I will settle with you in the morning"? A. — Just as he turned away.
Q. — Had not the matter been actually settled at that time? A. — It seemed so.
Q. — Don't you know that Mr. Cochrau had come out there and agreed to assume the payment of the bill and told Rudder about it and they were both going off together? A. — Yes, but I did not know the gentleman. *Page 178 
Some man was with Mr. Childers at the time, and this man was going off at the same time Childers was. He was talking in the talk with Jesse, but I do not know who he was. He went off at the same time Childers went off, and went with Childers. He just turned his back, going toward the postoffice. That was the direction also to the main entrance to the hotel. You would have to go by there to go to the postoffice. I do not know whether they were both stopping at the hotel at that time. He (Childers) turned his back to Rudder. He and his friend were going off down toward the postoffice or the main entrance of the hotel. He said something as he turned away. Draper came along and jumped in and said, "That is too hard for a cripple to take. If you want to fight a man, fight me, you G — d damned son of a bitch." He was talking to the defendant. He pulled his coat off and started to rush for him as he said that. He rushed near, until I got between them and pulled him back. They were not three feet apart, and he rushed again and the shot went off. He had to rush to get at Childers about four or five feet. It could be more, but it was that much anyhow. He bad to rush from the outside of the sidewalk clear across the sidewalk ten or twelve feet from where he started. When the deceased rushed at him Childers jumped back. He did not rush toward Draper; he just jumped back. He retreated three or four steps right back. He did not say a word at the time. He staid where he retreated to. While defendant was retreating the deceased was going forward. I tried to stop him. While Childers was retreating the other man was advancing. The deceased was rushing toward Childers in an angry manner. The deceased had his coat thrown back and came like this (indicating), and had one hand on his coat and the coat dropping off. They could not have been very far apart, as I had my hand on both men. I put my hand on Draper to try to stop him. I did not want to have any fight. I did not stop him. He was a stronger man than I was. He rushed by and I got between them again. It was while he was rushing by me that I told him to stop, "the son of a bitch has got a gun." He kept on just the same. It was not until after I had told Draper in the hearing of the defendant that the defendant had a gun, calling him a son of a bitch at the time; it was after that and after Draper continued to rush past me that the shot was fired. Childers was standing nearer the steps when he shot. He was standing where the light did not strike him, about three feet off from the steps. I followed the party out on the sidewalk. I went out so that Jesse would not get hurt. I did not know that he was going to get hurt, but I saw they were having a few words inside and I followed out to see what was going to happen. I was in the bar room also at the same time that Judge Dibble was there, and Albert Richardson and Draper and Jesse Rudder. There was still another man in there. I was in that part of the bar room right close to the door. I was away out from all of them. *Page 179 
I was about two feet from the bar facing the whole crowd like this (indicating). The rest of the people standing there could see me. I was talking to the deceased just before that. Judge Dibble was talking to him then, I was in the bar room at the time Jesse Rudder came in there about that back bill. I heard what he said; he was arguing. I was there at the time Childers and he went there together at the bar. I saw Childers leave the bar and go out. I followed right out behind him. He had his overcoat on his arm. I did not see any pistol there. I did not see him have his hand behind him. I was looking at him. I could have seen him, as I was watching him close. I did not see him go out in this position (indicating proximity of the right hand to the hip pocket). I was looking right at him. He was turning to go away from the place of the difficulty when I saw the pistol for the first time, and the only time that I saw it that evening. He had on a coat just like mine, I think, a cutaway, long-tailed coat. I do not think he had it buttoned up. He had his hands resting on his hips when he turned to go away from the place of the difficulty.
Q. — How was the pistol with reference to his hand? Did he have his hand over his pistol or not? A. — I could not say. I saw the pistol but could not tell whether his hand was on the pistol or over it.
Q. — Did you not see the hand over the pistol? A. — I could not tell whether his hand was over it or under it.
Q. — What part of the pistol did you see? A. — The handle or barrel, or something; the handle, I think.
Q. — Was it a pearl handle or black handle? A. — I couldn't exactly say whether it was stock or nickel-plated. I was standing on the right hand side of the defendant. I was looking at his right side at that time. I was standing at the end of the sidewalk. I imagined I saw that pistol through his coat tail. I saw it when he turned around.
Q. — Are you not mistaken about seeing that pistol? Have you not thought about it so much that you don't know whether you saw it then or at the time he actually fired? Are your recollections clear. A. — My recollection is not very good lately.
Q. — Is it not a fact that the only thing positively known to your recollection now is that the first time you saw that pistol was when it was discharged, when you saw the blaze of the pistol? A. — I certainly saw it at that time.
Q. — But you are not certain about any other time? Is it not a fact that the only time you positively know you saw that pistol on that occasion is when it was discharged in the hands of the defendant? A. — The only time I was positive I saw it; yes, sir. I went out there on that pavement that evening for the purpose of assisting Rudder in any assault he might choose to make on the defendant. I was there for that purpose. I don't know why James Draper was there. I only know what he did after he got there, During this altercation about the hack *Page 180 
bill nothing was said by anybody to James Draper, the deceased. Nobody struck him; nobody made any assault on him; nobody insulted him. After the shooting those people on the sidewalk pursued Childers. They made a noise; they raised a hue and cry, and it was then that he fled. Up to the time of making the noise and raising the hue and cry he walked away.
[The defendant offered in evidence a diagram, exhibit B, drawn by witness, showing the position of the parties.]
Re-direct examination: I testified in this case before the coroner, Judge McAllister, the next day after the killing. I testified before Judge King on the habeas corpus trial. I testified before Judge Noonan in this case. I never said on either of the other trials that I went out there for the purpose of assisting Jesse Rudder, but it was my intention. I did not so state, because I was not asked the question. Nobody has been talking to me since that time. I swear to that. I do not remember that I had much to say to Jesse Rudder the night of the killing. I may have had, but I do not remember so far back. I may have had twenty words of conversation with Jesse Rudder that night, but I don't remember. I did not see him before he came into the saloon. He did not talk to me when he came in. I do not remember if he talked to me when he came out. I went out by my own request on the sidewalk. I did not go as I know according to anybody's request. I went out to see that he (Rudder) would not get hurt. I thought Jesse Rudder was going to be hurt because I saw them arguing over something, and I followed them out to see what was going to happen. I believe I went out at my own solicitation. There had always been a friendship between me and Rudder. I had known him twelve months — since the second month I was here. I was so solicitous about going out there because I have known him ever since I came to town and I did not know the other man. The defendant did something to me one time and I went out there to see what was going to happen. Defend ant had insulted me. I went out to see what would happen to Jesse. I just went out that I might have a hand in it myself — that is, in any fighting that was going on; that is, if they were going to fight, Jesse and the defendant. Nobody asked me to go out or take a hand in it. It was at my own volition. When the defendant turned away and told Jesse Rudder that he would settle in the morning, and called him that epithet, he said he was going to give him his money in the morning. I could not say whether calling him a son of a bitch settled it. He called him that when he turned around and left him. This was the time when he had his hand on his pistol. I could not have seen it before. He was in front of me at the time and when he turned around I did see it. I don't know whether he had his hand on his pistol when he called him that word or not. I think it was right away after. I don't know whether Draper could have seen the pistol or not. He was *Page 181 
facing Draper sidewise. Draper was on the right hand side. While he was talking to Jesse Rudder his back would be to Draper. When he turned around Draper was at his side. When Draper was running toward him Draper ran to his face. I tried to jump on Childers. I was between the two, but could not hold Draper because he was stronger. I had hold of Draper and was grabbing at Childers. I had hold of him like this, by the coat. I was between the two holding the coat of each and Draper rushed by me like this. It was as close as this (indicating with a hand on each). [His testimony in thehabeas corpus trial was now exhibited to witness, and he was asked if that was his signature and whether he swore to that on the habeascorpus trial.] He said: I don't know whether I swore to that or not, but it is my signature. The defendant turned away when he called Jesse a son of a bitch. Jesse also turned toward the plaza. Then Draper ran in and told the defendant, "If you want to fight, fight me, you G — d damned son of a bitch." He was just pulling off his coat when he said that (the witness here indicates how he was pulling off his coat), and dropped it on the sidewalk. I could not say if his coat dropped before or after he was shot. I tried to keep Childers and him apart and grabbed for him. I don't know why I did so. Draper was on my left side. My left arm was to Draper. When Draper was shot he was rushing on the defendant. He was near enough for me to touch. I was trying to get hold of him. I did not see any arms on Draper at any time, either before or after he was dead, not so much as a pocket knife. I testified this on a former trial: "I had one hand on Draper and one on the defendant; I had a hand on each of them at the time the shot was fired and my face was burned by the powder." This was the truth when I testified to it. I know my face was burned, but I don't know whether I got my hands on both or not. I could not say whether I so testified or not. I know my face was burned. I know I tried to grab both, but I could not say what time it was. I could not say if my recollection was better then than it is now. I had fever two or three weeks ago. I don't know whether I had fever when I testified on the habeas corpus trial or not. I was rattled at the time. I recollect testifying on the habeas corpus trial, but I don't know what I did testify right now. Everybody rattled me on the habeas corpus trial. I don't know if I am very easily rattled. Witness was asked this question: "Did you testify on the habeas corpus, that `at the time he was shot deceased had his left arm out of his coat'?" A. — I know he started to pull off his coat. It was the left arm. He had one arm dropping out. It was the right one. He had the coat off when he was shot, I know that. I think it was the left arm out of his coat, but I am not sure. I do not know which arm it was. I recognized the coat of the deceased Draper now exhibited to me. I have seen this coat many times. The coat was dropping off when I saw it and at the time he was shot. At the time *Page 182 
he was shot he had the right sleeve of his coat on his right arm like this (holding out his arm in front of him nearly horizontal). His arm was extended out in that way. Draper was coming on like this (brushing past witness).
Q. — I will read a little further: "He dropped the coat after he was shot either on the door or on a chair outside, from the other arm." A. — I don't know the place were it was dropped; I could not say where it was dropped.
Q. — Answer me; when you swore on that habeas corpus trial, did you know whether it was the truth or not? A. — I don't remember what I swore.
Q. — Do you know what you swear here to-day? A. — Yes, sir. I was much more rattled on the habeas corpus trial than I am to-day. I had never at that time been in a court before.
Q. — Did you swear to this that I have just read? A. — I said I did not know which place it was where he dropped it. [State's attorney reads to witness as follows: "Defendant had a pistol in his hand at the time he was talking to Rudder. It was just at his side and the tail of his coat was just kind of shading it."] May be you can tell me whether you swore to that on the habeas corpus trial; did you? A. — That is what I suppose.
Q. — Did you swear to that paragraph I just read? A. — I believe I did if it is there, and I say the same right now. I imagine he had a pistol in his hand at the time he was talking to Rudder. I saw the handle of a pistol. [State's attorney reads as follows: "He had the pistol in his hand at the time he called Rudder a son of a bitch; at the time he turned to leave Rudder. He had the pistol in his hand before Draper said anything to him."] Did you swear to that? A. — Yes, I believe I did. I supposed I was swearing to the truth. Yes, I did, because I saw his hand on it. It must be true. I guess I did say that defendant had a pistol in his hand before Draper said anything to him. I say the same now. I could not say how many minutes he had the pistol in his hand before Draper said anything to him. I state now it may not have been two minutes, may be not one. The defendant spoke to Rudder in a kind of angry, not very angry tone. I have often been angrier than that. I would not be sure whether he called him a liar or son of a bitch. When he said, "I will settle with you in the morning, you son of a bitch," and said that to Jesse, I did not take Jesse's part because everything was quiet and settled. The word I have just used I use very often myself. I was not very far off from defendant when Draper spoke this; probably about ten feet or eleven feet, or six or four feet.
Q. — By State's attorney: Did you not testify on the habeascorpus trial, "At the time I told deceased that the defendant had a gun I had *Page 183 
my hand on the breast of deceased and I was not more than eighteen inches from deceased?" A. — I do not know whether it was eighteen inches or two feet.
Q. — Did you not testify in another place this way: "I had seen the defendant have a pistol three minutes before that. He was doing nothing with it at the time; he just had it in his hand." A. — I could not say what time it was. I know I saw it, but I could not say what time it was. I don't remember all of it, but I remember the last of it — the liar or son of a bitch. He turned to leave; that is all I remember of it. I don't remember whether at the time defendant made that remark any one tried to get him away.
Q. — Did you testify to this [reads]: "At the time defendant made the remark, `I will settle with you, you son of a bitch, in the morning,' the friend of defendant tried to get defendant away?" A. — I don't know who the man was.
Q. — Did somebody try to get him away? A. — He was there with him. I don't know what he wanted to do with him. I testified that there were two men there. I don't know whether they were going to take him away or not.
Q. — Did you not follow that out by saying: "Defendant turned on his heel toward his friend and did not make another step one way or the other." Did you testify to that on the habeas corpus or not? A. — I said toward the hotel or postoffice. I don't know whether I testified that on the habeas corpus or not. Witness was shown his statement and said: I signed that and swore to it. I would not have sworn to a thing that was a lie.
Q. — You have got it down here this way: "After he called him a son of a bitch he turned toward his friend and did not make another step one way or the other." Is that the way of it? A. — It may be and may be not; I don't know which way the man was going to turn.
Q. — Let me read a little further: "The defendant turned right around and fronted him, and the defendant turned and Draper started to pull off his coat and rushed at defendant." Is that true? A. — Yes, both rushed at one another. They both confronted each other.
Q. — Did you not go on and state as follows: "The defendant then stepped over again from the wall toward deceased, reaching his hand from his pocket." Did you so testify on the habeas corpus trial?
A. — Yes.
Q. — And this too: "At this time they were both coming together and were within three feet of each other." Is that true? A. — I could not tell; they were coming together.
Q. — "The defendant simply advanced one foot before the other."
A. — I said backward.
Q. — Are you the same St. Clair that swore before Judge King?
 A. — Yes. *Page 184 
Q. — "The defendant simply advanced one foot before the other and Draper came on with one arm out of his coat; then I rushed in to hold deceased off. I got to deceased first and held him off. I was trying to prevent a difficulty." Yes, I remember that.
Q. — You said a while ago that you went out there to get into a difficulty.
A. — Yes, I did.
Q. — Here you swear, that "I was trying to prevent a difficulty."
A. — I did not want to have any trouble.
Q. — You went out there to assist Rudder? A. — Yes, and I would do it again.
Q. — "I was closer to Jim than I was to defendant when Jim made this remark and rushed in. I had a good view of the pistol, and am positive that the barrel of the pistol was not bright. When I first went out on the pavement I saw the defendant with his right hand on his side just close to his coat, and his other hand was just dropping down on his side and making a kind of a motion." Now, when you first went out on the pavement, did you see his hand? A. — Yes, I saw his hand.
Q. — "The defendant kept his hand in that position until the shooting was done?" A. — Of course he did. I could not say whether he moved it or not. If I swore that defendant kept his hand in that position until the shooting was done it must be true, and is true as far as I remember right now.
Q. — Did you not repeat it again before Judge King and say, "He kept his hands in the same position they were in when I went out until the shooting actually took place?" A. — I don't remember half that took place. I don't know how long I was out there before the shooting took place.
Recross-examination: I am not rattled now. I do not know why I got rattled last time. I am not positive that I saw that pistol before I saw it fired. There was a pistol there. I would not be positive; I saw something there. When I saw the motion of his hand that way I supposed there must be something there (indicating right hip pocket). He was right in front of Jesse Rudder at that time. He was standing facing Rudder. I will not be sure if Jesse was looking at him or not. As he turned he had Jesse on his right hand, and passed right by Jesse with his side exposed to him. I have no interest in this case. I testified on the last examination. I was sworn here to-day as a witness for the State.
Q. — By Mr. Paschal, district attorney: You told Mr. Aubrey you don't know whether it was a pistol or not. Did he shoot him with a pocket handkerchief? A. — I say I was sure it was a pistol after the shooting. I know it was a pistol, but I don't know whether it was bright or not. I imagined it was a pistol, but I was not sure. I am sure it was a pistol when it was discharged, because I saw it. I had good cause; I got my face burned. *Page 185 
E. G. Starnes, a witness for the State, being sworn, testified: My name is E. G. Starnes; my profession is that of medicine. I know W. H. Ellis. He is a relative of mine. He is my brother-in-law. He has left the State. His intention was to leave the State permanently. He left the State about July last, 1890. His intention was to open some business in San Francisco, Cal. I have had occasional correspondence with him by letters through the United States mail. They were written from San Francisco, Cal.; Albuquerque, N. M.; and Flagstaff, Ariz. My latest correspondence was in December last. My wife has received correspondence since that time, some time in last month. He was then in Flagstaff. I have not written to him since Christmas. I wrote to him then in San Francisco. I received an answer in December. My wife has been writing occasionally to him. These letters were mailed at the postoffice here to Albuquerque, N. M.; Flagstaff, Ariz.; and San Francisco. I have received no answer since December. My wife received letters last month.
Cross-examination: I do not know where W. H. Ellis is of my own knowledge. I do not know whether or not he is in the city of San Antonio.
Redirect examination: I have no reason to believe he is here.
The State then introduced, over the objection of defendant, a copy of the testimony of W. H. Ellis, in writing, taken on application for a writ of habeas corpus before the Hon. W. W. King, district judge of the Forty-fifth Judicial District, November 30, 1889, as follows: My name is W. H. Ellis. I know the defendant by sight. I knew James Draper. He is dead. He died on the night of the 26th of November. On Tuesday night I went to the Menger Hotel to look for a party and I went into the office and inquired if he was in. I was informed that he had gone to bed. I left my card and went out through the bar. I went into the bar through the side door leading from the office of the Menger into the bar. I lit a cigarette. I noticed the defendant and another gentleman and Rudder standing at the bar. The other gentleman was Mr. Cochran. I heard a conversation something about a hack bill. I did not pay much attention to the conversation. After I lit my cigarette I heard the hackdriver Rudder say, "I will get my money," and started out the door. Rudder went out and the other two gentlemen followed — or perhaps they may have all gone out together. They went out and stopped in a few paces of the door and I stopped in the doorway. They engaged in conversation, and in the conversation I heard Mr. Cochran say, "What is our bill?" and the hackdriver gave him some time, how long he had been hauling him, and the defendant spoke up and said, "That is a damned lie." Mr. Cochran then spoke to the hackdriver and told him that he would pay the hack bill in the morning. The hackdriver then asked him where must he come to get it, and Mr. Cochran told him to come to the Menger. *Page 186 
The defendant then ran his hand into his pocket and drew out some coin. I do not know how much, but it did not look to be over a dollar or so, and he says, "Mr. Cochran, I told this damned fellow I would pay his bill in the morning, and this is all the money I have." Mr. Cochran then caught hold of him and told him to come and go to bed, and perhaps pulled him a couple of steps, and he pulled away from Mr. Cochran. Then Cochran caught him again and tried to get him to go to bed, and he pulled away and said to Mr. Cochran, "I want to tell this damned son of a bitch what I think of him," and he went back to Rudder. Then the young man that got shot, who was standing with his hand against the box that is around the tree, said, "Don't call that man a son of a bitch; he is a cripple;" and he began pulling off his coat, and in pulling off his coat walked toward the defendant. I do not know whether he got all of his coat off or not, however. Just at that time the defendant run back and Mr. St. Clair or some one run up and grabbed at the defendant. At that time the defendant stepped back and thrust his hand forward and I heard the report of the pistol. I then took a little back stand in the door. The deceased hallooed, "I am shot!" and run in the door. The defendant then started away from the scene in a pretty pert walk, a little faster than an ordinary walk, and he stopped and looked back, and I hallooed out, "Halt! You have shot a man!" and he went down the street that way on the east side of Alamo Plaza toward Carter Mullaly's, but a little faster. I continued running behind him and hallooing at him, "Halt!" and when he got under the light, opposite Carter Mulllaly's livery stable, I saw the pistol. He had it in his hand, and when he got to the corner going down Crockett street I hallooed again, "Halt!" As I got opposite the stable some one ran out and grabbed at me. It was one of the employes of the stable. I know the man when I see him. I turned the corner at the corner of East Alamo Plaza and Crockett, and I hallooed out again to the defendant to halt. He then checked a little, enough to look around, and I fired off my pistol. I continued to run after him until I got to Bonham Street, back of the Menger Hotel. A little before I got to the corner of Crockett and Bonham I left the sidewalk and ran out nearly to the center of the street. I saw the defendant still running a little over half way of the block. I hallooed several times at him to halt. And I noticed him again when he got under the gas light at the corner on Bonham Street back of the Menger. I ran on the opposite side of the street. I got another good view of him when he turned the corner of Bonham and East Commerce. He then started down East Commerce Street westward. Not quite half way down East Commerce there are some boards for posting. He ran behind these boards, and that is what hid him from me. I ran on down the street, about in front of the Car. When I got back to the Menger Draper was dead. When the defendant broke away *Page 187 
from Mr. Cochran and said he wanted to tell the damned son of a bitch what he thought of him, the tone of his voice was that of a mad man — of a man who is angry. At the time he made that remark Rudder was about six or seven feet away from him. Rudder was not saying or doing anything to him at the time he made that remark. He went toward Rudder; he went toward him in a kind of fast walk. I was nearly to the left side of the defendant at the time he went toward Rudder. The manner of the defendant at the time he went toward him was a kind of pert walk. I never noticed the position of the defendant's hand at the time he made that remark. At about the time the defendant was advancing toward Rudder the deceased made the remark. I am not positive whether he was starting to walk or just about getting ready to start. Rudder, the hackdriver, known as "Shorty," is a short man. He is crippled and don't seem to be a very strong man. Defendant apparently seems to be a very healthy man. He is a taller man than Rudder. I judge the defendant will weigh more than Rudder. At the time the defendant made the remark that he wanted to tell the damned son of a bitch what he thought of him, the defendant appeared to me a good deal stouter man than Rudder did. I know a man by the name of St. Clair. I recognized him at the inquest as the man who was there. I never heard him say anything, but some one there grabbed the defendant or grabbed at him. The man that I saw at the inquest looked to be the man. All this happened in Bexar County, State of Texas.
Cross-examined: I did not see the deceased in the bar room at all while I was in there. Mr. Rudder started out of the bar room a little first and the others went out a little after him, or may have left together. I went out right behind the defendant and Mr. Cochran. I don't think the deceased passed me. I first saw the deceased when the defendant and Rudder were talking together in the presence of Mr. Cochran outside on the pavement. This was after I came to the door and was standing there at the door. My attention was attracted to the deceased when he spoke. When he said, "He is a cripple; don't call him a son of a bitch," he just begun pulling off his coat. He was approaching the defendant at the time he was pulling off his coat. I think he was making steps toward him. The defendant partly motioned out his hand and I heard the pistol fire. The deceased advanced a little in pulling off his coat. At the time the defendant made the remark to Rudder the defendant and the deceased were something between seven and twelve feet apart. They were a little nearer together than the full width of the sidewalk, because the deceased was standing against the tree. At the time the shot was fired the defendant and the deceased were not over seven or eight feet apart. My eyes were more on the deceased than they were on the defendant, because he was pulling *Page 188 
off his coat. At the time I saw the man pulling off his coat I stepped aside and back so as to put myself within side of the wall. Before Draper made the remark stated, the defendant had made no remark whatever to the deceased. The defendant made no remark or threatening gesture against the deceased before the deceased made the remark to him. The tone of voice and expression of the deceased was in an angry manner. I never heard the deceased use the expression, "You damned son of a bitch." I never heard the deceased use the words, "son of a bitch." Rudder was close by when the action of the deceased toward the defendant took place. I was closer to the defendant than Rudder was at the time the remark was made by the deceased. Mr. Rudder was nearer the deceased than I was. The deceased was the subject of my observation all the time from the time I came out and took my position in the door until the deceased made his remark and begun to take off his coat. It might have been fifteen or twenty minutes before the matter was all over, but it was not more than half an hour. I did not see the defendant when he drew the pistol from his pocket. I never saw the pistol in the defendant's hands. I threw my eyes on the deceased when he began to pull off his coat, and before I turned around I heard the report of the pistol and heard the deceased say, "I am shot!" I did not see the pistol in the hand of the defendant at or before the shot was fired. I had observed the defendant very closely before that. I did not see any pistol in the hands of the defendant at any time before the firing. I occupied a position higher than the other parties. It was quite light out there; I could see everything. I saw his hands several times and did not see any pistol. I think I could have seen if he had one. The defendant occupied many positions during the time of the conversation between Mr. Cochran, Rudder, and the defendant while I stood in the door. At times he would have his right side to me; other times he would have his left side to me; other times he would be facing me, and as many times as the other positions he would have his back to me. He was sometimes closer to me than at other times. He never was further from me than eight to ten feet. Up to the time the deceased begun to pull off his coat I was observing the defendant more closely than the other, as he was the figure of the concern. My attention was not diverted from him as long at any time as two or three minutes. Childers, Rudder, and Cochran were all under my observation, so that I could glance from one to the other and see anything that either one of them would do. Redirect: For a minute or two before the firing of the shot I did not observe where the hands of the defendant were and what they were doing. I did not see any arms in the hands of Draper; no stick, weapon, or knife of any kind. At the time he was pulling at his coat he had nothing in his hands but the lappel of his coat. *Page 189 
Recross: Time might have passed when things occurred that I did not see. I do not know whether or not there was anything in the hands of the deceased.
Mrs. E. F. Dukes, a witness for the State, being sworn, testified: My name is E. F. Dukes. I know H. H. Childers. I have known him several years; I don't know exactly how long. November 26, 1889, I was living at the corner right back of the Menger Hotel, on Bonham Street, No. 202. I was then running medicated baths. My place is right back of the Menger Hotel. Bonham Street runs right back of the Menger Hotel, north and south. I saw the defendant at my house the night of November 26, 1889. I can not tell exactly what time of night, but somewhere after 12. I was sitting up with a sick man and don't remember the time; in fact I did not remember to see what time it was. The defendant rang the bell. I had been sitting up with this sick gentleman in order to take care of him. I went to go to bed, but before I undressed I heard the bell ring. I never heard it before at that time of night. I went in the room and opened the window and asked who it was, and he said, "Madam, let me in; I am in trouble;" and I said, "Who are you?" and he said, "Childers," and I knew him and I let him in the house. He was not stopping with me, but I said before he came to bring a sick man for me to take care of, and Sunday, I think, he and his friend called at my house. He was wet; his feet and legs were wet and muddy, and he told me he was in trouble; and he said, "I had a difficulty with a man and I shot at him, and I don't know whether I have hurt him or not." He asked me if I had a boy, and I told him I had, and he asked me if I would let him go and see what was done, and said, "If I have hurt the man I will go and give myself up." He said he had got in the water but did not say where. He did not say how long he had been in the water. I asked him how long he had been out, and I think he said an hour or two. He did not tell me how long he had been in the water. He was very much excited. I went off to look for some dry clothes and I did not have very much conversation with him, and I tried to get him not to send out that night but to wait until morning, and he said he wanted to find out what he had done. The boy's name was Tom. He sent a note by Tom. Tom did not come back that night. This gentleman I was waiting on sent Tom out to get some whisky, and he did not come back. Tom got some dry clothes before he went out and put on Mr. Childers and put him to bed, and I went in then and wrapped his feet up in some warm blankets and he seemed to get quiet. He was very much excited. He told me he had had trouble with this man and did not know whether he had hurt him or not, and if this boy went out and did not come back this gentleman would go to the hotel. I left his room and did not go in again, and when I heard he had killed a man I did not go in to tell him. I learned that he had killed a man when this gentleman went *Page 190 
to the hotel. That was about 1 or 2 o'-clock, I suppose. There is no running water near my house, but about a block or two from there there is one of the irrigating ditches that run around town. The nearest one is south on Commerce Street. I believe that is the only one I have ever crossed. That is about two blocks from Bonham Street. I saw a pistol lying on the table that Mr. Childers must have laid there. I did not see him lay it there, nor did I see him have it. I did not see him have any pistol when he came in. There was one on the table in that room. That is the room in which he slept that night. I do not know what become of that pistol. I had not slept any that night and I went to sleep, and the next thing I heard was the bell ring, and I got up and the gallery was full of men, and I asked what it was, and one of them said, "We are officers, and want to get in your house," and I opened the door and let them in. Mr. Childers told me he wanted the boy Tom to go to the hotel and see his friend Frank and see what he had done. I never saw the note he sent at all. The officers came that morning a little before sunrise, I think. Childers staid there until they came.
Cross-examination: When the officers came Mr. Childers was in bed in the room where he went to bed, and the door was not locked, for I went and opened it and let the officers in. If it had been locked in the night I did not know it. He seemed to go to sleep when I left him that night, and pulled the door to, and I did not see him again until I let the officers in. I did not tell Mr. Childers about the officers being there before I let them in. I opened the door and they stepped in and then I opened Childers' door. Tom did not come back that night. The officers came before Tom got there. Mr. Childers told me he wanted to send for his friend Frank, and if he had done any harm he would go and give himself up, and when I learned the man was dead I did not go in the room. He was too much excited and I did not go in to tell him and his friend never came. That is all I know. It was about 12 that he reached my house that night. I had not gone to bed.
Captain Philip Shardien, a witness for the State, testified: My name is Philip Shardien. I am city marshal, and was occupying that position in November, 1889. I knew James Draper in his lifetime. About 2:30 on the morning of the 27th of November, 1889, I was called up and came down to the office. I there found a note reading as follows: "Dear Frank: Follow this darky; ask no questions and you will find me. If there is any serious trouble I don't want to know it except from you. Bring me some whisky. H. H. C." I know only from hearsay when this note was brought in. [Defendant by his counsel here admitted that the note just testified to by Captain Shardien was the note sent by the boy Tom from the defendant to his friend Frank Cochran, the note coming from Mrs. Dukes' house.] I was present when the arrest was made. I made the arrest of the defendant. I found *Page 191 
the place through the negro boy Tom Payne. I got there about 4 o'clock in the morning. I placed policemen around the two houses — that is, the one on the corner and the one occupied by Mrs. Dukes and the one that adjoins it, and watched these houses until after daylight. Then I walked up to the front door and asked for admission, and Mrs. Dukes came and said she hoped she would not get into trouble. She seemed to know what I was after, and asked me to let her go in and see Childers, and I followed her into the room. The officers followed me in and I found him in bed. There was a pistol found there. I don't know where the pistol was. It was handed me by an officer in the room. I searched the bed and the room was searched for the pistol. I was talking to Mr. Childers when the pistol was handed to me by Gerhard, the city detective. The search went on three or four or five minutes; I don't know how long. I got no information from any one as to where the pistol was found. Defendant's clothing was wet, including his shoes. I don't remember seeing an overcoat there. He was taken from there to his room to change his clothing. I believe I saw an overcoat in his room. It was not wet. If I saw one, and I am almost certain I saw an overcoat in his room, it was not wet. I don't remember of its raining that night. There is a ditch in the vicinity of the Menger Hotel, running right through the hotel from the south. It runs along a short street that runs south from the Menger Hotel from Blum Street to Commerce Street. His shoes were wet and muddy. I saw him after daylight, between 6:30 and 7 o'clock. I did not examine that pistol. It was a Smith Wesson five chamber, and I think about a 38-caliber. [Pistol is shown witness and he says it looks like the pistol. It was a pistol of that make and size.]
Cross-examination: After the pistol was handed me in the presence of defendant he said that was the pistol he did the shooting with. I don't remember if he asked me what damage was done. I explained to him what he was arrested for. He did not deny shooting at deceased. Redirect examination: He did not tell me where the pistol was. I asked him. He told me it would do no good if I found it.
Recross examination: It may have been somebody else's pistol. The pistol was handed to me by City Detective Gerhard. He found it in the bureau drawer in the room where I found Childers.
Here the State closed.
Defendant offered in evidence the depositions of Geo. Peters and Dr. Willoughby Walling, witnesses residing in the city of Louisville, Ky. The same being objected to by the State as irrelevant and immaterial, were excluded and not permitted to be read on that ground by the court.
L. D. Dibble, a witness for the State, recalled by the defendant, testified as follows: In my testimony yesterday I said I saw the defendant *Page 192 
Childers when he left the bar room before the shooting. I was looking at him as they went out. I was standing with Draper, the man who was shot, at the time. When Jesse started and made the remark that he was going to have his money and he knew how he could get it, he started on a run toward the street entrance to the bar room — not the entrance where Draper and I were standing; and he said he knew how he could get it and started out, and the two gentlemen that were with him started right out. I was looking at him (defendant) when he went out the door. They left the counter and went out of the room at the street entrance. I don't know whether I saw defendant's hands during that time or not. I don't think I noticed his hands when I looked around and saw them running out. Jesse went pretty fast and they followed him up. I did not see defendant make any demonstrations of a hostile character in there toward Jesse or any one else. I did not see anything indicating any disposition to hostility toward Jesse Rudder or any one else while in the bar room by defendant. All I saw was them following Jesse out. There was no loud talk by any one. I recollect this, that when Jesse demanded the money of him standing at the counter he said he did not owe him anything, Jesse said he did and he was going to have his money, and said he knew how to get it, and then he started out the door and the two gentlemen followed him. What attracted my attention was the talk between the two about the money. I did not see the defendant Childers put his hand under his coat in the region of his hip pocket while he was in there. I did not notice anything of the kind from any of them. Childers and the other two stood beyond Jesse, so Jesse stood between them and me, but I saw no demonstrations of a hostile character like feeling for weapons at any time. I don't know if, as they were going out of the bar room, such a movement as that of feeling for weapons in the region of the hip pocket had been made by defendant I would have noticed it, because I did not pay any further attention to it. I was talking to Draper, the man that was shot, at the west end of the bar at the entrance that goes into the billiard room. Draper went out just about the same time that they went out, he being right there where he could get out. At the west end of the bar there is an opening or door where they were accustomed to go through into the billiard room, and the general entrance to the street was where Jesse stood when he said he was going to get his money and knew how to get it, and started for the general street entrance and they followed him right out; and I saw no offers of drawing weapons or anything of that kind, for I was talking to Draper, and he went out that door just about the same time they went out the other. Perhaps Draper had gone out a quarter or half a minute before. I said yesterday that Jesse Rudder came into the bar room before defendant did and asked the barkeeper for his money, if any money had been left there, and he said, *Page 193 
"I want to get my money here," and that "there ought to be money left for me." Then he went out and left these two gentlemen in the room. He went right back and took his place next to them and they followed right along behind him at his right hand. Draper, during the conversation of Rudder and defendant and his friend, was talking with me and Russell. We were talking together except when Russell was called away to attend to his duties at the bar. He never joined in the conversation at any time about this dispute in regard to the back fare.
This is a conviction of murder in the second degree, with punishment assessed at confinement in the penitentiary for the term of fifteen years. A few days before the homicide two men by the names of Peter and Walling pointed out to defendant the deceased, on the streets of San Antonio, as the man who had told them of many exploits of a kind to illustrate his dangerous and desperate character, and of such variety and extent as would tend to cause any person to whom the same were narrated to believe that an assault by deceased would be one calculated to create a reasonable apprehension in the mind of a person attacked by deceased of death or serious bodily harm. Upon the trial the defendant proposed to prove these facts, but the district attorney objected on the grounds of immateriality and irrelevancy. The court sustained the objection and refused to admit the testimony. The defendant excepted and reserved a bill of exceptions to this ruling of the court. The facts of this case render this proposed testimony of the greatest importance, and the reporter will insert them in full.
If defendant had reasonable grounds for believing and did believe Draper (deceased) a dangerous and violent man, he had the right to act on that belief whether Draper was such a man or not. But can the accused establish the grounds for such belief in the manner proposed. He could prove such a character for the deceased by general reputation, the presumption being that the accused know of the general reputation.
But suppose that in fact the defendant did not know of the general reputation of his adversary, certainly his conduct should not be judged in the light of the general reputation of his adversary, though ever so bad, for not knowing such general reputation his conduct or acts could not in any manner have been influenced or controlled by such reputation. Grissom v. The State, S Texas Ct. App., 386. *Page 194 
In Brumley v. The State, 21 Texas Court of Appeals, 240, it was said by this court: "It is a rule, not only statutory but almost of universal acceptation, that a party may act upon reasonable appearances of danger, and that whether danger is apparent or not is to be determined from the defendant's standpoint." If the accused had reasonable grounds for believing, and did believe, that the deceased was a dangerous man, the source of his information or belief is altogether immaterial. The law does not permit testimony to be given of the dangerouscharacter of a deceased upon the principle of justification, for it is just as much a violation of law to unlawfully kill a man of dangerous or violent character as to kill a man whose character is that of peace. But such testimony is admissible for the purpose of judging the conduct of the accused from his standpoint and in the light of all the surrounding facts and circumstances attending the homicide and as the same appeared to him. In this way alone can you properly determine the motives that controlled and governed his act. If the accused was in fact influenced and controlled by his belief that the deceased was a dangerous or desperate man, what matters it to him whether that belief be occasioned by the general reputation of the deceased, which the accused is only presumed to know, and which in fact he may not know, or whether that belief was generated by the statements of the deceased himself, the question at last being, did that belief exist and was the conduct of the accused influenced by it? It was the province of the jury to pass upon these questions, and they certainly could not do so unless they were in possession of all the facts and circumstances known to the accused, and which he claimed influenced or controlled his conduct.
Mr. Bishop clearly states the rule of law applicable to this question, as follows: "Except in capital executions under judicial sentence no evil in a person, however extreme, will justify or palliate the taking of his life. Therefore proof of the character, conduct, or utterauces of the deceased is not ordinarily admissible in trials for homicide. But as a help to the understanding of motives and purposes it may be to a limited extent in special circumstances now to be explained. Thus the defendant to excuse or mitigate his acts claims that they were in selfdefense or passion. The particulars of the transaction being thus material and the law judging him by the facts and necessities as theyappeared to him, whatever they truly were, he may give in evidence anything known to him of the character, prior conduct, threats, or other utterances of the person with whom he was contending, which, not as showing that the man was bad, but that in the special instance and circumstances he was dangerous, might reasonably have place among the considerations guiding his actions." 2 Bish. Crim. Proc., secs. 609, 610. The testimony of the witnesses Peter and Walling was admissible, and the court erred in excluding it. *Page 195 
It appears from defendant's bill of exceptions that the State introduced and read in evidence over objection and exception of appellant the testimony of one Ellis given before Judge King on hearing of a writ of habeas corpus, and reduced to writing and signed by Ellis. The appellant objected to this testimony on the ground among others that the same was hearsay, and also objected that a proper predicate had not been laid. Whether a proper predicate had been laid is not a question deemed necessary to be determined here under the view we take of the case made by the bill of exceptions. The testimony admitted was of a very important character and very damaging to appellant, and the question is whether it was, in the form in which it was offered, such as could be legally admitted at all, or in other words, is a habeascorpus proceeding an "examining trial" and the court in which it occurs an "examining court" within the meaning of article 774, Code of Criminal Procedure. It is unnecessary to discuss what the rule is upon this subject at common law in the state of the record. Johnson v. The State,27 Texas, 758. See also article 25, Code of Criminal Procedure. Therefore the material inquiry is, have we a statute that authorizes the admission of this evidence? It is contended that article 774, Code of Criminal Procedure, authorizes the admission of such testimony, on proof of the proper predicate being laid, as provided for in articles 772, 773, Code of Criminal Procedure.
Article 774 reads as follows: "The deposition of a witness taken before an examining court or a jury of inquest and reduced to writing and certified according to law, in cases where the defendant was present when such testimony was taken and had the privilege afforded him of cross-examining the witness, may be read in evidence, as is provided in the two preceding articles for the reading in evidence of depositions." In order for such testimony to be admissible under this article it is necessary that the same should have been taken before an examining court or a jury of inquest. The next step in the solution of this question is to determine what constitutes an examining court. This question is solved by the statute, for it expressly defines what constitutes an examining court. Article 63, Code of Criminal Procedure, reads as follows: "When a magistrate sits for the purpose of inquiring into a criminal accusation against any person, this is called an examining court." Article 26 of the Penal Code reads as follows: "A criminal action as used in this code means the whole and any part of the procedure which the law provides for bringing offenders to justice; and the terms `prosecution,' `criminal prosecution,' `accusation,' and `criminal accusation' are used in the same sense." Our statutes do not define what a magistrate is, but very clearly state who are magistrates and what their duties are. A magistrate is "a public civil officer, invested with some part of the legislative, executive, or judicial power given by the Constitution, etc. The President of the United States is *Page 196 
the chief magistrate of the nation; the governors are the chief magistrates of their respective States. In a narrower sense the term only includes inferior judicial officers, such as justices of the peace, etc." 13 Am. and Eng. Encyc. of Law, pp. 1198, 1199.
Article 42 of the Code of Criminal Procedure is as follows: "Either of the following officers is a magistrate within the meaning of this code: The judges of the Supreme Court, the judges of the Court of Appeals, the judges of the District Court, the county judge of the county, either of the county commissioners, the justices of the peace, the mayor or recorder of an incorporated city or town."
Article 43 of the Code of Criminal Procedure is as follows: "It is the duty of every magistrate to preserve the peace within his jurisdiction by the use of all lawful means; to issue all process intended to aid in preventing and suppressing crime; to cause the arrest of offenders by the use of lawful means in order that they may be brought to punishment."
In order for a court to be an examining court within the meaning of the statute under discussion, we think that a magistrate must preside as a magistrate for the purpose of inquiring into a criminal accusation preferred against a person on trial, and this duty must be enjoined upon him as a magistrate by the law. That those judges who have the power to issue the writ of habeas corpus do not have this power because they are magistrates, but they possess this power because it is conferred upon them by the Constitution. Judges of the Supreme Court have the power to act as magistrates, to cause offenders to be arrested and bound over or discharged. They do not do this as judges of the Supreme Court, but as magistrates authorized to perform these acts. Yet notwithstanding they are magistrates in the performance of these acts, they can not issue the writ of habeas corpus. The judge of the District Court can entertain a complaint against a citizen, can have a trial upon it, can admit to bail, discharge, or commit to jail the offender, but in performing these duties he acts not as judge of the District Court, but as a magistrate. A justice of the peace is ex officio a notary public, but when he is performing a judicial duty he acts as a justice of the peace and not as a notary public. Any magistrate, whether he be a judge of the Supreme Court or the mayor or recorder of an incorporated town or city, has the power to hold an examining court, but no magistrate as such has been given the power to issue the writ of habeas corpus. "A writ ofhabeas corpus is an order issued by a court or judge of competent jurisdiction, directed to any one having a person in his custody or under his restraint, commanding him to produce such person at a time and place named in the writ, and show why he is held in custody or under restraint." Code Crim. Proc., art. 131. "The Court of Appeals or either of the judges, the District Courts or any judge thereof, the County Courts or any judge thereof, have power to *Page 197 
issue the writ of habeascorpus, and it is their duty upon proper application to grant the writ under the rules herein prescribed." Art 135, Code Crim. Proc. In issuing the writ of habeas corpus the act is that of the court or of the judge of the court and not the act of a magistrate, and the trial upon the same is not an examining court held by a magistrate, but is a trial before a court or the judge of the court. The objects and purposes of an examining court and a habeas corpus proceeding are essentially different. In the former the object is to determine whether a person who is accused of an offense is guilty and whether he should be discharged or bailed. In the latter the object is to determine whether the citizen is unlawfully restrained of his liberty. In the former the proceedings are in an examining court before a magistrate; in the latter before a court or the judge of a court to whom in the particular matter jurisdiction is specifically given. These views are in accord with a previous decision of this court. In the case of Hart v. The State, 15 Texas Court of Appeals, 226, occurs this language: "After providing generally for the jurisdiction of justices, the Constitution declares that they may have `such other jurisdiction, criminal and civil, as may be provided by law under such regulations as may be prescribed by law.' Const., art. 5, sec. 19. In prescribing their powers and jurisdictions article 1543, Revised Statutes, provides that `they shall also have and exercise jurisdiction over all other matters not hereinbefore enumerated that are or may be cognizable before a justice of the peace under any law of this State.' With regard to the final trial of causes coming within his jurisdiction, whether civil or criminal, the statute evidently contemplates that the action and jurisdiction of the justice court shall be limited by and to his precinct unless otherwise expressly authorized by the law in certain exceptional cases. But he is furthermore a `magistrate,' made so by the terms of the statute equally with the judges of the Supreme Court, Court of Appeals, district and county judges (Code Crim. Proc., art. 42), and when a magistrate sits for the purpose of inquiring into a criminal accusation against any person this is called an `examining court.' Code Crim. Proc., art. 63. At such time he is a `magistrate' and not a `justice of the peace,' and his court an `examining' and not a `Justice Court.' A warrant of arrest may be issued by a magistrate (Code Crim. Proc., art. 232), and when issued by a judge of the Supreme Court, Court of Appeals, District or County Court, shall extend to every part of the State. Code Crim. Proc., art. 237. But when issued by any other magistrate it can not be executed in any other county except in certain instances mentioned. Code Crim. Proc., art. 238. It may, however, he issued to and executed anywhere in his county outside of as well as in his own precinct.
"When sitting as an `examining court' the law nowhere limits the magistrate if he be a justice to his particular precinct; and not being in this regard, there is no reason why it was not intended he should *Page 198 
hold the court in any portion of the county most convenient for the purpose of the examination as to the commitment or discharge of the accused (Code Crim. Proc., chap. 111), whether the place of the sitting be in the precinct of another justice competent and qualified to act or not." From this decision it is manifest that a justice of the peace has a dual character. Those matters conferred upon him and to be exercised by him as a justice of the peace constituting one, and those conferred upon him to be exercised by him as a magistrate constituting the other. This is equally so of the judges of the Supreme, District, and County Courts. The judges of the Supreme Court are magistrates, but can not issue the writ of habeas corpus. The judges of the District Courts are magistrates and can issue the writ of habeas corpus. Is this by virtue of any power given to magistrates? Most certainly not. It is by virtue of the power given them as courts or judges thereof. Then in the exercise of this power it follows that the writ is issued by a court or the judge thereof and not by a magistrate, and the proceeding is not in an examining court and is not carried on before a magistrate. Article 774 contemplates that the testimony should be reduced to writing and certified according to law, etc. Article 267, Code of Criminal Procedure, which relates to an examining trial before a magistrate, requires the testimony to be reduced to writing, signed by the witness, and certified to by the magistrate taking the same. We can find no such provision relating to a habeas corpus trial before a court or judge, and this fact strengthens our view that article 774 was not intended to embrace the testimony taken before a judge on habeas corpus trial. Evans v. The State, 12 Texas Ct. App., 383.
We are of the opinion that the testimony of the witness Ellis taken before the judge on habeas corpus trial was not admissible in evidence, and the court erred in admitting the same.
We have carefully considered all the evidence contained in the record, but in view of the disposition made of this case we do not deem it necessary to say whether in our opinion the testimony is sufficient or not to support a conviction for murder in the second degree.
For the errors discussed in this opinion the judgment is reversed and the cause remanded.
Reversed and remanded.