## W. B. ROMINE v. THE STATE.

No. 18557.   Delivered December 16, 1936.
Rehearing Denied February 24, 1937.

The opinion states the case.

*Sam Holland* and *Landman & Landman,* all of Athens, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for murder; punishment, twenty-five years in the penitentiary.

There was no denial of the fact of the killing of deceased by appellant, by shooting him with a shot gun. An eye-witness, not related to either party, testified that after shooting deceased with the shot gun appellant struck him on the head with the gun, breaking the stock, and then again struck deceased with the barrel. The shot entered under the left arm of deceased and went almost through the body. The jaw of deceased was

broken by one of the blows. The defense was based on threats made by deceased. The charge of the court presented all of the issues in such manner as was acceptable to the accused, no exception being reserved to the charge for any reason.

We find seven bills of exceptions in the record. Bill No. 1 was taken to the action of the court in allowing the State to introduce in evidence an application for continuance made by the appellant and duly signed by him. We can not tell from the bill whether the contents of the application supported the exceptions taken or not, since neither the application nor the testimony supposed to be contradictory, to the statements contained in the application,—appear in the bill of exceptions.

Another bill complains of the refusal of the court to let appellant prove by the wife of deceased how many times she and deceased separated. There is nothing in the bill showing what her answer would be, nor how same could in any way be material to any issue in this case.

Another bill sets up as error the action of the court in sustaining the State's objection to proof by a witness that he had seen deceased chasing his father-in-law. Nothing in this bill is so connected up or stated as to enable us to see how it could be material to any issue in this case. The next bill of exceptions sets out what purports to be a reconciliation in the family of deceased, his father-in-law and appellant some time before this killing. The proposed testimony sheds no light upon the facts surrounding or connected with the killing in this case, and was properly rejected.

Another bill proposes to prove that a witness had heard deceased making threats against his own father. This appears to be an entirely disconnected transaction if proven, and could afford no justification to the accused. A great many witnesses were introduced pro and con upon the question of the reputation of all parties concerned. Another complaint is of the rejection of the testimony of a witness who was asked whether or not the father of deceased said that Frank (deceased) had made some threats against him. We do not see the relevancy of the proposed testimony.

The remaining bill of exceptions complains of the refusal of a new trial apparently based upon the alleged discovery by appellant, after the trial, of the fact that certain jurors sat in the case who had previously expressed opinions concerning it. The court heard evidence, and was fuly justified in overruling the motion for new trial.

Finding no error in the record, the judgment will be affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—Appellant complains on motion for rehearing of the disposition made of bills of exception numbers three, five and six. He invokes the rule that where self-defense is an issue appellant may prove specific acts of violence committed by deceased on others, if appellant knew of them prior to the homicide, to show the state of appellant's mind, and to shed light on the standpoint of appellant at the time of the homicide. Appellant relies on Childers v. State, 30 Texas Crim. Rep., 160, 16 S. W., 903; Knighton v. State, 100 Texas Crim. Rep., 516, 271 S. W., 906; White v. State, 88 Texas Crim. Rep., 159, 225 S. W., 511; Bullock v. State, 73 Texas Crim. Rep., 419, 165 S. W., 196; Hysaw v. State, 69 Texas Crim. Rep., 562, 155 S. W., 941; Crow v. State, 48 Texas Crim. Rep., 419, 88 S. W., 814. Many other cases are found cited in Branch's Ann. Tex. P. C., page 1175, Sec. 2094. Unquestionably, appellant asserts a correct proposition of law. The point before us is, do the bills of exception in the light of the record show that appellant has been deprived of his legal rights in the premises?

Frank Williams was the party killed. Apparently appellant was his own first witness. He testified as follows:

"I know of the trouble he (deceased) had with his father-in-law from what he (deceased) told me. Mr. McKee had come to his house and spent two or three days. Frank Williams was out in the servant house and his wife called him and jumped on to him about being out there talking to this other woman, and he began giving her advice; then the old man said; 'If I had known you all got along like this, I would have stayed at home, and wish I was at home.' Frank Williams then said he made the old son-of-a-bitch shut up. He told me of having Hugh Pickle down in the road and —— 'made him go back to the house and that otherwise he would have bumped him off.' I know of a difficulty Frank Williams had with his own father, from what he told me. He told me his father came to his house some time in January, 1936, after a gun that belonged to his father. He said: 'Old Man Tom came down there and I whipped the old son-of-a-bitch;' that he whipped his daddy with a walking stick, 'and I'd have killed the old grey-headed son-of-a-bitch but wanted to show him he could

not sell any more land.' He said he chased his father and ran him into old man Moore's house, then left there and went to Pearl Qunn's; that he ran him to Mr. Moore's house and that is as far as he went. I know that the officers came down there to get Frank Williams and arrested him and put him in jail. Old man Tom Williams is about eighty years old, so Frank Williams said. It was in January, 1935 that this is supposed to have happened, the 19th, I believe, but I am not positive. It was shortly afterward that Frank Williams told me about this, three or four days later."

Bill of exception number three shows that appellant asked a witness, Rufus McLendon, if during the month of April, 1933 he had seen deceased chasing his father-in-law. The court sustained objection to the question. The bill then recites that "appellant urged that he (appellant) had knowledge of the fact that deceased had chased his father-in-law, and expected the witness to so testify." There is no further statement in the bill as to what evidence the witness would have given on the subject. We think this is not sufficient. However, when we look to the statement of facts it reveals that J. P. McKee— the father-in-law mentioned—gave testimony as follows:

"Some time during April, 1933, I had occasion to visit in the home of Frank Williams and his wife. While there there was no difficulty on my part, but Frank Williams got very abusive with me and he was standing by his gun. He was cursing, and I made the remark to my daughter that I guessed I'd go home; that I did not stay around such places as that. He informed me he could curse when he damned pleased; it was not my damn business. I said, that is all right. He made some threats against my life, and I told Mr. Romine about it; I told him before the killing."

Bill of exception number five recites that Mrs. Pearl Quinn testified that she had heard deceased make threats against his father, that he used an oath and said he would beat his daddy with a walking cane. When asked if deceased said anything else, witness answered "No." At this point attorney for the State moved to strike "that out" on the ground that it had not been shown that any threat against his father by deceased had been communicated to appellant. The court then admonished counsel not to ask about matters of which appellant had not been apprised. The bill fails to show that the court withdrew any of the witness' testimony, but does show that counsel for appellant asked the court if he was striking out all of her testimony, and that the court said "that part that is *now shown* to

be communicated to the defendant." The bill in this regard is confusing. It shows that the court was not intending to exclude anything of which appellant had knowledge, and apparently meant by the words "now shown" to be excluding only such things as were being shown communicated to appellant for the first time at the trial. This view is strengthened when the witness' testimony in the statement of facts is examined. It there appears the witness did testify as follows:

"I had occasion to see Frank Williams around January or February, 1935, and he came over to my house. He told me that he had beat hell out of the old man with a walking cane. I don't know what time this was exactly, but it was in the spring. It was after he had got out of jail up here."

This fact was known to appellant at the time of the killing.

Bill of exception number six brings forward complaint that the trial court excluded evidence from the witness Silas Moore as to mistreatment and threats, by deceased against his own father. It appears from the bill that the evidence sought from this witness would have been hearsay. His evidence found in the record shows that deceased's father came to witness' home much excited and kept rubbing his shoulder and said deceased had hit him on the shoulder with a gun; that while deceased's father was there deceased himself came to the house and talked to his (witness') wife, which conversation witness did not hear. Mrs. Silas Moore did testify that on the occasion mentioned deceased came to her house and she refused to let him in and that:

"He told me he wanted a shot gun. He did not say he was going to kill his daddy right then, but said he was going to kill him. I don't remember what else he said. His father was there in the house while Frank Williams was saying this. The 'law' was called over my telephone by my husband. Mr. Williams had my husband call them, and they came to my house."

It further appears from the testimony of Lonnie Romine, Mrs. J. P. McKee, Mrs. Romine (appellant's wife), Woodrow McKee, and Dallas Kramer, that evidence was permitted to go to the jury regarding the treatment by deceased of his father, and threats towards him, of which appellant knew or had been informed. Kramer was the officer who responded to the call from Mrs. Moore's house, and testified that deceased father told him deceased had "hit him over the head and shoulder with a walking cane." Witness arrested deceased on that occasion and he paid a fine for drunkenness. The testimony given by Woodrow McKee upon the point at issue follows:

"I have heard Frank Williams make a threat in regard to his own father. He told me he had run his father up to old man Silas Moore's and ran him into the house, and that Mrs. Moore got between him and the door; that he had a double barrel shot gun and started to kill that damn old Mrs. Moore and go on in and kill old man Tom Williams, his father."

From an examination of the entire record it appears that the trial court was extremely liberal in permitting the jury to know all the unfortunate family bickerings in which deceased was claimed to have been engaged. Appellant and deceased had married sisters. It was appellant's claim that deceased had trouble with his own father and his father-in-law, of which things appellant knew, either from what deceased himself had told appellant, or which had been communicated to him by those who had witnessed deceased's acts of violence towards others, or heard him utter threats.

We have been unable to reach the conclusion that it is made to appear from the bills of exception that appellant was deprived of any right to have the jury advised of those things which he knew about deceased which operated on his mind at the time of the homicide.

The motion for rehearing is overruled.

*Overruled.*